Barry I. Levy, Esq.
Michael A. Sirignano, Esq.
Joshua D. Smith, Esq.
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees Insurance*
*Company, GEICO Indemnity Company, GEICO General*
*Insurance Company and GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------------X
GOVERNMENT EMPLOYEES INSURANCE
COMPANY, GEICO INDEMNITY COMPANY, GEICO
GENERAL INSURANCE COMPANY, and GEICO                      Docket No.:_____ (        )
CASUALTY COMPANY,

                                    Plaintiffs,

            -against-

SMS THERAPY SUPPLY, INC., SHUSHANA
MIRZOKANDOV, and JOHN DOE DEFENDANTS "1"
through "10",

                                    Defendants.
--------------------------------------------------------------------X

## COMPLAINT

Plaintiffs, Government Employees Insurance Company, GEICO Indemnity Company,

GEICO General Insurance Company, and GEICO Casualty Company (collectively "GEICO" or

"Plaintiffs"), as and for their Complaint against defendants, SMS Therapy Supply, Inc., Shushana

Mirzokandov, and John Doe Defendants "1" through "10" (collectively, the "Defendants"), hereby

allege as follows:

**NATURE OF THE ACTION**

1.      This action seeks to recover the monies that Defendants wrongfully obtained from GEICO, and expunge the pending fraudulent billing submitted by Defendants, relating to medically unnecessary, illusory, and otherwise unreimbursable durable medical equipment ("DME") in the form of purported sustained acoustic devices ("SAM Units" or the "Fraudulent Equipment") allegedly dispensed by SMS Therapy Supply, Inc. ("SMS Therapy Supply" or the "DME Provider") on a rental basis.  The DME Provider purportedly dispensed and rented the Fraudulent Equipment to New York automobile accident victims insured by GEICO ("Insureds") without regard for patient care or whether there was any medical necessity for the Fraudulent Equipment, often using forged prescriptions to support inflated billing to GEICO.

2.      SMS Therapy Supply is owned and controlled by Shushana Mirzokandov ("Mirzokandov" or the "Provider Owner").  Mirzokandov, along with John Doe Defendants "1" through "10", devised a scheme to exploit New York's No-Fault insurance system by targeting the prescription and dispensing of purported SAM Units because these devices have no specific billable code and no specific reimbursement amount, which Defendants used to bill GEICO inflated charges for each SAM Unit rented to a patient, typically totaling $2,964.00 in rental charges for each device per patient.

3.      In furtherance of the scheme, the Defendants colluded with the operators and managers (the "Clinic Controllers") of various No-Fault medical clinics (the "No-Fault Clinics") and various physicians and other healthcare providers (the "Prescribing Practitioners") that prescribed durable medical equipment to the Insureds treating at the clinics, to steer prescriptions for the Fraudulent Equipment to the DME Provider, to the extent actual prescriptions were even issued.

4.      As part of the scheme, the Defendants intentionally utilized forged and unauthorized prescriptions to claim entitlement to inflated fees to which they were never entitled. Indeed, one physician who allegedly authorized prescriptions for SAM Units dispensed by the DME Provider has stated that she never prescribed any such device and did not even know what the device was used for.  Moreover, the Defendants submitted forged and unauthorized "Rebuttal to Peer Review Reports" to the American Arbitration Association allegedly authored by licensed doctors in connection with No-Fault insurance collection arbitrations brought by SMS Therapy Supply seeking reimbursement of pending claims for the SAM Units.

5.      By this action, GEICO seeks to recover more than $51,645.26 that has been wrongfully obtained by the Defendants, and further seeks a declaration that it is not legally obligated to pay reimbursement of more than $714,511.94 in pending no-fault insurance claims that have been submitted through the DME Provider, because:

(i)      Defendants billed GEICO for the Fraudulent Equipment that was not medically necessary and was prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care;

(ii)     Defendants, in many instances, billed GEICO for the Fraudulent Equipment as a result of forged, unauthorized, or illegally duplicated prescriptions;

(iii)    Defendants billed for the Fraudulent Equipment purportedly provided to Insureds through the use of unlawful kickback and financial arrangements;

(iv)    to the extent that any Fraudulent Equipment was provided to Insureds, the bills submitted by the Defendants fraudulently inflated the charges to GEICO.

6.      The Defendants fall into the following categories:

(i)      SMS Therapy Supply (or the "DME Provider") is a New York corporation that purported to dispense the Fraudulent Equipment to persons who were allegedly injured in motor vehicle accidents, and billed New York automobile insurance companies, including GEICO;

(ii)    Mirzokandov (or the "Provider Owner") is the individual who owns and controls the DME Provider, and who used the DME Provider as part of a fraudulent scheme to submit bills to GEICO and other New York automobile insurance companies for purportedly dispensing the Fraudulent Equipment to automobile accident victims; and

(iii)    the John Doe Defendants are individuals who are presently not identifiable, but who knowingly participated in the fraudulent scheme by, among other things, assisting with the operation of the DME Provider and the dispensing of the Fraudulent Equipment, engaging in illegal financial and kickback arrangements to obtain patient referrals for the DME Provider, and furthering the predetermined fraudulent protocols used to maximize profits without regard to genuine patient care.

7.    As discussed below, the Defendants at all times have known that the claims for Fraudulent Equipment submitted to GEICO by the DME Provider were fraudulent because: (i) the Defendants billed GEICO for Fraudulent Equipment that was not medically necessary and was prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; (ii) the Defendants, in many instances, billed GEICO for Fraudulent Equipment as a result of forged, unauthorized, or illegally duplicated prescriptions; (iii) the Defendants billed for the Fraudulent Equipment purportedly provided to Insureds through the use of unlawful kickback and financial arrangements; and (iv) to the extent that any Fraudulent Equipment was provided to Insureds, the bills submitted by the Defendants fraudulently inflated the charges to GEICO.

8.    As such, the Defendants do not now have – and never had – any right to be compensated for their claims for the Fraudulent Equipment.

9.    The chart attached hereto as Exhibit "1" sets forth a representative sample of the fraudulent claims that have been identified to date that the Defendants submitted, or caused to be submitted, to GEICO by the Defendants under the names of SMS Therapy Supply.

10.     The Defendants' fraudulent scheme against GEICO and the New York automobile insurance industry began in 2019 and continues uninterrupted through the present day in that the Defendants continue to attempt collection on the bills for the Fraudulent Equipment.

## THE PARTIES

### I.    Plaintiffs

11.     Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company are Nebraska corporations with their principal place of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in New York.

### II.    Defendants

12.     Defendant SMS Therapy Supply is a New York corporation with its principal place of business at 97-77 Queens Boulevard, Tower Floor, Rego Park, New York.  SMS Therapy Supply was incorporated on February 11, 2019, and is owned by Mirzokandov and has been used by the Defendants as a vehicle to submit fraudulent billing to GEICO and other New York automobile insurers.

13.     Defendant Mirzokandov resides in and is a citizen of New York. Mirzokandov is not and has never been a licensed healthcare provider.

14.     Upon information and belief, the John Doe Defendants are citizens of New York and individuals who are presently not identifiable, but who knowingly participated in the fraudulent scheme by, among other things, assisting with the operation of the DME Provider and the dispensing of the Fraudulent Equipment, engaging in illegal financial and kickback arrangements to obtain patient referrals for the DME Provider, and furthering the predetermined fraudulent protocols used to maximize profits without regard to genuine patient care

## JURISDICTION AND VENUE

15.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interests and costs, and is between citizens of different states.

16.     Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over claims brought under 18 U.S.C. § 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ["RICO"] Act) because they arise under the laws of the United States.

17.     In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

18.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS COMMON TO ALL CLAIMS

19.     GEICO underwrites automobile insurance in New York.

I.     **An Overview of the Pertinent Laws**

      **A. Pertinent Laws Governing No-Fault Insurance Reimbursement**

20.     New York's "No-Fault" laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the healthcare services that they need.

21.     Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65, et seq.) (collectively referred to as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to Insureds.

22.     In New York, No-Fault Benefits include up to $50,000.00 per Insured for medically necessary expenses that are incurred for healthcare goods and services, including goods for DME and OD. See N.Y. Ins. Law § 5102(a).

23.     In New York, claims for No-Fault Benefits are governed by the New York Workers' Compensation Fee Schedule (the "New York Fee Schedule").

24.     Pursuant to the No-Fault Laws, healthcare service providers are not eligible to bill for or to collect No-Fault Benefits if they fail to meet any New York State or local licensing requirements necessary to provide the underlying services.

25.     For instance, the implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12) states, in pertinent part, as follows:

> A provider of healthcare services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York or meet any applicable licensing requirement necessary to perform such service in any other state in which such service is performed.

(Emphasis added).

26.     In State Farm Mut. Auto. Ins. Co. v. Mallela, 4 N.Y.3d 313, 320 (2005), the New York Court of Appeals confirmed that healthcare service providers that fail to comply with licensing requirements are ineligible to collect No-Fault Benefits, and that insurers may look beyond a facially-valid license to determine whether there was a failure to abide by state and local law.  In Andrew Carothers, M.D., P.C. v. Progressive Ins. Co., 33 N.Y.3d 389, 393 (2019), the New York Court of Appeals reiterated that only licensed physicians may practice medicine in New York because of the concern that unlicensed physicians are "not bound by ethical rules that govern the quality of care delivered by a physician to a patient."

27.     New York law prohibits licensed healthcare service providers from paying or accepting kickbacks in exchange for referrals for DME. See, e.g., N.Y. Educ. Law §§ 6509-a; 6530(18); 6531; 8 N.Y.C.R.R. § 29.1(b)(3).

28.     Prohibited kickbacks include more than simple payment of a specific monetary amount, it includes "exercising undue influence on the patient, including the promotion of the sale of services, goods, appliances, or drugs in such manner as to exploit the patient for the financial gain of the licensee or of a third party". See N.Y. Educ. Law §§ 6509(10), 6530(17); 8 N.Y.C.R.R. § 29.1(b)(2).

29.     Pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company and receive payment for medically necessary goods and services, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or, more commonly, as an "NF-3").

30.     In the alternative, a healthcare service provider may submit claims using the Healthcare Financing Administration insurance claim form (known as the "HCFA-1500" or "CMS-1500 form").

31.     Pursuant to Section 403 of the New York State Insurance Law, the NF-3 Forms submitted by healthcare service providers to GEICO, and to all other insurers, must be verified subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

8

32.     Similarly, all HCFA-1500 (CMS-1500) forms submitted by a healthcare service provider to GEICO, and to all other automobile insurers, must be verified by the healthcare service provider subject to the following warning:

> Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties.

**B.      Pertinent Regulations Governing No-Fault Benefits for DME**

33.     Under the No-Fault Laws, No-Fault Benefits can be used to reimburse medically necessary DME that was provided pursuant to a lawful prescription from a licensed healthcare provider. See N.Y. Ins. Law § 5102(a). By extension, DME that was provided without a prescription, pursuant to an unlawful prescription, or pursuant to a prescription from a layperson or individual not lawfully licensed to provide prescriptions, is not reimbursable under No-Fault.

34.     DME generally consists of items that can withstand repeated use, and primarily consists of items used for medical purposes by individuals in their homes. For example, DME can include items such as bed boards, cervical pillows, orthopedic mattresses, electronic muscle stimulator units ("EMS units"), infrared heat lamps, lumbar cushions, orthopedic car seats, transcutaneous electrical nerve stimulators ("TENS units"), electrical moist heating pads (known as thermophores), cervical traction units, whirlpool baths, cryotherapy, continuous passive motion devices, and devices to prevent deep vein thrombosis.

35.     Title 20 of the City of New York Administrative Code imposes licensing requirements on healthcare providers located within the City of New York which engage in a business which substantially involves the selling, renting, repairing, or adjusting of products for the disabled, which includes DME.

36.     It is unlawful for any DME/OD supplier to engage in the selling, renting, fitting, or adjusting of products for the disabled within the City of New York without a proper Dealer in Products License.  See 6 RCNY § 2-271; NYC Admin. Code §20-4425-426.

37.     To ensure that Insureds' $50,000.00 in maximum No-Fault Benefits are not artificially depleted by inflated DME charges, the maximum charges that may be submitted by healthcare providers for DME are set forth in the New York Fee Schedule.

38.     In a June 16, 2004 Opinion Letter entitled "No-Fault Fees for Durable Medical Equipment", the New York State Insurance Department recognized the harm inflicted on Insureds by inflated DME charges:

> [A]n injured person, with a finite amount of No-Fault benefits available, having assigned his rights to a provider in good faith, would have DME items of inflated fees constituting a disproportionate share of benefits, be deducted from the amount of the person's No-Fault benefits, resulting in less benefits available for other necessary health related services that are based upon reasonable fees.

39.     As it relates to DME, the New York Fee Schedule sets forth the maximum charges as follows:

> (a)     The maximum permissible charge for the purchase of durable medical equipment… and orthotic [devices] . . . shall be the fee payable for such equipment or supplies under the New York State Medicaid program at the time such equipment and supplies are provided . . . if the New York State Medicaid program has not established a fee payable for the specific item, then the fee payable, shall be the lesser of:
>
> (1) the acquisition cost (i.e., the line item cost from a manufacturer or wholesaler net of any rebates, discounts, or other valuable considerations, mailing, shipping, handling, insurance costs or any sales tax) to the provider plus 50%; or
>
> (2) the usual and customary price charged to the general public.

See 12 N.Y.C.R.R. § 442.2.

40.     As indicated by the New York Fee Schedule, payment for DME is directly related to the fee schedule set forth by the New York State Medicaid program ("Medicaid").

41.     According to the New York Fee Schedule, in instances where Medicaid has established a fee payable ("Fee Schedule item"), the maximum permissible charge for DME is the fee payable for the item set forth in Medicaid's fee schedule ("Medicaid Fee Schedule").

42.     For Fee Schedule items, Palmetto GBA, LLC ("Palmetto"), a contractor for the Center for Medicare & Medicaid Services ("CMS"), was tasked with analyzing and assigning HCPCS Codes that should be used by DME companies to seek reimbursement for – among other things – Fee Schedule items. The HCPCS Codes and their definitions provide specific characteristics and requirements that an item of DME must meet in order to qualify for reimbursement under a specific HCPCS Code.

43.     The Medicaid Fee Schedule is based upon fees established by Medicaid for HCPCS Codes promulgated by Palmetto.  Medicaid has specifically defined the HCPCS Codes contained within the Medicaid Fee Schedule in its Durable Medical Equipment, Orthotics, Prosthetics and Supplies Procedure Codes and Coverage Guidelines ("Medicaid DME Procedure Codes") which mimic the definitions set forth by Palmetto.

44.     Where a specific DME does not have a fee payable in the Medicaid Fee Schedule ("Non-Fee Schedule item") then the fee payable by an insurer such as GEICO to the provider shall be the lesser of: (i) 150% of the acquisition cost to the provider; or (ii) the usual and customary price charged to the general public.

45.     For Non-Fee Schedule items, the New York State Insurance Department recognized that a provider's acquisition cost must be limited to costs incurred by a provider in a "bona fide arms-length transaction" because "[t]o hold otherwise would turn the No-Fault

reparations system on its head if the provision for DME permitted reimbursement for 150% of any documented cost that was the result of an improper or collusive arrangement." See New York State Insurance Department, No-Fault Fees for Durable Medical Equipment, June 16, 2004 Opinion Letter.

46.    As it relates to charges for renting DME, the New York Fee Schedule sets forth the maximum charges as follows:

> the maximum permissible monthly rental charge for such equipment, supplies and services provided on a rental basis shall not exceed the lower of the monthly rental charge to the general public or the price determined by the New York State Department of Health area office. The total accumulated monthly rental charges shall not exceed the fee amount allowed under the Medicaid fee schedule.

See 12 N.Y.C.R.R. § 442.2(b).

47.    As indicated by the New York Fee Schedule, the total monthly rental cost for Fee-Schedule items shall not exceed the lower of: (i) the monthly rental charge to the general public; or (ii) the monthly fee permitted under the Medicaid Fee Schedule.

48.    Additionally, DME suppliers are not entitled to separate charges for supplies and services provided in conjunction with the rental of DME.

49.    Regardless of whether DME is provided for patients to keep or rented to patients, the maximum reimbursement rates set forth above includes all shipping, handling, and delivery. See 12 N.Y.C.R.R. § 442.2(c). As such, DME suppliers are not entitled to submit separate charges for shipping, handling, delivery, or set up of any DME.

## II.    Defendants' Fraudulent Scheme

### A.    Overview of the Scheme

50.    The Defendants devised and implemented an egregious fraudulent scheme in which they used the DME Provider to exploit patients for financial gain by billing the New York

automobile insurance industry for hundreds of thousands of dollars in inflated rental charges – which they were not eligible to receive – for the Fraudulent Equipment purportedly dispensed and rented to the Insureds.

51.     The DME Provider did not market or advertise to the general public, lacked any genuine retail or office location, and operated without any legitimate efforts to attract patients who might need DME or healthcare practitioners who might legitimately prescribe DME.

52.     Similarly, the Provider Owner did virtually nothing that would be expected of the owner of a legitimate DME supply company to develop its reputation in the medical community or to attract patients who might need DME or healthcare practitioners who might legitimately prescribe DME.

53.     Instead, the Defendants entered illegal, collusive agreements with the Clinic Controllers and various Prescribing Practitioners working at various No-Fault medical clinics (the "No-Fault Clinics) and steered them to prescribe and direct large volumes of the same prescriptions (or purported prescriptions) to the DME Provider for the specifically targeted Fraudulent Equipment – i.e., SAM Units -- which equipment was purportedly prescribed and dispensed to treat patients at the No-Fault Clinics.

54.     Unlike legitimate medical supply companies that dispense a variety of DME devices and healthcare related products, the DME Provider intentionally focused on and targeted SAM Units because these devices have no specific billable code and no specific reimbursement amount, ostensibly allowing the Defendants to use a "miscellaneous" HCPCS code -- E1399 -- to bill for the devices.  SAM Units, in fact, were the only item of DME (along with associated coupling patches) that the DME Provider dispensed and rented to Insureds.

55.     The Defendants, using the absence of a specific billable code for SAM Units, chose the Fraudulent Equipment because they could acquire these small, portable devices at low cost and submit false claims for reimbursement to GEICO for the purported lengthy rental of the devices to patients, typically for a period of 6 weeks at a time with rental charges amounting to $2,964.00, per Insured.

56.     The Fraudulent Equipment billed by the DME Provider purports to be a "multi-hour" low intensity ultrasound device for home-use but the device has not been proven effective for treating the injuries sustained by the Insureds involved in automobile accidents.

57.     SMS Therapy Supply's home rentals of the SAM Units were not medically necessary, were often dispensed using forged, unauthorized, and illegally duplicated prescriptions, and were often supported by forged "Rebuttal to Peer Review" reports used to corrupt the New York No-Fault arbitration process and fraudulently mislead No-Fault arbitrators into awarding reimbursement for the Fraudulent Equipment to the DME Provider.

58.     Further, to the extent SMS Therapy Supply actually provided the SAM Units to Insureds, the SAM Units were prescribed and dispensed pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds.

59.     The prescriptions obtained by the DME Provider that were generated at the No-Fault Clinics were not only often forged or unauthorized but were pre-printed prescription "forms" designed to facilitate the referral of the expensive SAM Units in predetermined fashion, using the exact same format, exact same print font, and exact same language.

60.   The Defendants used the pre-printed prescription forms to facilitate the prescription and referral of the SAM Units and the steering of those prescriptions to SMS Therapy Supply to submit in support of the fraudulent claims for reimbursement.

61.   To conceal the volume of billing submitted by SMS Therapy Supply for each Insured, the Defendants typically unbundled the charges, submitting the bills for the rental of the SAM Units into multiple bills, and occasionally with overlapping dates, using the "miscellaneous" billing code E1399, to bill as follows:

- Bill No. 1:

| Date of Service | Place of Service Including Zip Code | Description of Treatment or Health Service Rendered | Fee Schedule Treatment Codes | Charges |
|---|---|---|---|---|
| 11/30/20-12/13/20 | Home | Coupling Patches | E1399 Qty:1 | $120.00 |
| 11/30/20-12/13/20 | Home | Sustained Acoustic Medicine | E1399 Qty:14 | $868.00 |
| | | | Total Charges to Date: | $988.00 |

- Bill No. 2:

| Date of Service | Place of Service Including Zip Code | Description of Treatment or Health Service Rendered | Fee Schedule Treatment Code | Charges |
|---|---|---|---|---|
| 12/4/20-12/17/20 | Home | Coupling Patches | E1399 Qty:1 | $120.00 |
| 12/4/20-12/17/20 | Home | Sustained Acoustic Medicine | E1399 Qty:14 | $868.00 |
| | | | Total Charges to Date: | $988.00 |

- Bill No. 3:

| Date of Service | Place of Service Including Zip Code | Description of Treatment or Health Service Rendered | Fee Schedule Treatment Code | Charges |
|---|---|---|---|---|
| 12/17/20- 12/30/20 | Home | Coupling Patches | E1399 Qty:1 | $120.00 |
| 12/17/20- 12/30/20 | Home | Sustained Acoustic Medicine | E1399 Qty:14 | $868.00 |
| | | | Total Charges to Date: | $988.00 |

62.     The Defendants spearheaded their fraud scheme involving the Prescribing Practitioners and the Clinic Controllers knowing that (i) the Fraudulent Equipment was often prescribed and dispensed using forged, unauthorized and illegally copied prescriptions; (ii) the Fraudulent Equipment, to the extent actually prescribed and dispensed, was done so pursuant to predetermined protocols designed to exploit the patients for financial gain, without regard to genuine patient care; (iii) the Fraudulent Equipment was the product of illegal, collusive arrangements intended to inflate the billing from SMS Therapy Supply to insurers and to financially enrich the Defendants; (iv) the Defendants intentionally targeted a specific item of DME (i.e., SAM Units) that they acquired at low cost and dispensed in large volumes to Insureds at inflated charges; and (v) the Defendants used forged "Rebuttal to Peer Review" reports to corrupt the New York No-Fault arbitration process and fraudulently mislead No-Fault arbitrators into awarding reimbursement for the Fraudulent Equipment to the DME Providers.

**B. Defendants' Corruption of the No-Fault Billing and Arbitration Processes Through Submission of Forged Prescriptions and Forged Medical Reports**

63.     In keeping with the fact that SAM Units were not medically necessary but rather prescribed and dispensed pursuant to predetermined fraudulent protocols and collusive kickback arrangements, many of the charges submitted by the Defendants to GEICO were submitted based

on forged or unauthorized prescriptions using the names of various Prescribing Practitioners.

64.     For example, SMS Therapy Supply submitted billing to GEICO for the purported rental of numerous SAM Units along with pre-printed prescription forms that purport to be signed by Patricia Kelly, M.D. ("Dr. Kelly").  The prescription forms -- which prescribe the rental of a SAM Unit for multiple weeks and state that, among other things, the "sam unit is medically indicated and in my opinion is reasonable and necessary to treat this patient's condition" – are forged and unauthorized.

65.     Dr. Kelly, a physician associated with Metro Pain Specialists P.C. ("Metro Pain") and its successor company, Triborough NY Medical Practice ("Triborough"), stated in an affidavit that she only wrote prescriptions for DME on very rare occasions and "*never issued prescriptions for Sustained Acoustic Devices (SAM unit).*"  Dr. Kelly further stated that she "reviewed referral prescriptions from SMS Therapy Supply Inc. for a SAM Pro Unit with Coupling patches…and that she "did not authorize or prescribe any of the DME on these bills and prescriptions."  She further stated that "[t]he signature on the referral prescriptions from SMS Therapy Supply Inc. is not mine, and I did not prescribe the SAM Pro Units with Coupling Patches indicated nor authorize them to be dispensed.  I do not know what the SAM Pro Units with Coupling Patches are, and I would not have prescribed them."

66.     In keeping with the fact that Dr. Kelly's name, signature, and license was misused without her permission by SMS Therapy Supply while she associated with Metro Pain and its successor company, Metro Pain has been named as a defendant in multiple affirmative fraud cases involving fraudulent services billed to No-fault insurers, including State Farm Mut. Ins. Co. v. Metro Pain Specialists, P.C., et al., 21-cv-05523 (E.D.N.Y. 10/5/2021) and Allstate Ins. Co. v. Metro Pain Specialists P.C., et al., 21-cv-05586-DG-RER (E.D.N.Y. 10/7/2021).  After Metro Pain

was sued, that professional corporation was essentially closed and Triborough opened in its place.

67.     Further, many additional charges submitted by SMS Therapy Supply to GEICO were based on prescriptions for SAM Units issued by various healthcare practitioners that contained a photocopied and/or stamped signature of the practitioner, were issued without the prescribers' knowledge or consent, or were issued by the practitioner as part of a fraudulent predetermined protocol, likely as a condition of maintaining their employment at one of the No-Fault Clinics.

68.     For example, multiple charges submitted by SMS Therapy Supply to GEICO were based on prescriptions for SAM Units allegedly issued by a chiropractor, Marcelo Quiroga, D.C., ("Quiroga") who operated his "practice" at a clinic located at 204-12 Hillside Avenue, Queens. This clinic is identified in government affidavits filed in a criminal case as being controlled by unlicensed laypersons and receiving patients as the result of illegal kickback and referral arrangements.  See United States of America v. Anthony Rose, et al., 19-cr-00789 (PGG) (S.D.N.Y.) ("USA v. Rose").  Not surprisingly, the prescriptions allegedly issued by Quiroga submitted by SMS Therapy Supply to GEICO in support of the charges for the rental of SAM Units contain a photocopied or stamped signature of Quiroga.

69.     In keeping with the fact that the prescriptions for SAM Units issued by the Prescribing Practitioners were issued used without the prescribers' knowledge or consent, or were issued by the practitioner as part of a fraudulent predetermined protocol, SMS Therapy Supply often submitted with its bills to GEICO either a forged "Letter of Medical Necessity" purportedly authored by the prescribing doctor or a "Letter of Medical Necessity" containing only a photocopied or stamped signature of the prescribing doctor.

70.     The fraudulent and "copy and paste" nature of the Letters of Medical Necessity

submitted by SMS Therapy Supply to GEICO is further illustrated by other instances where the first page of a Letter of Medical Necessity references one doctor as the author, but the last page contains a stamped signature of a completely different doctor.  For example, in multiple instances SMS Therapy Supply submitted a Letter of Medical Necessity that indicates it was written by Dr. Hong Pak, M.D., but contained a photocopied signature of a different doctor by the name of Jongdog Park, D.C.

71.     Moreover, as part of the fraudulent scheme, SMS Therapy Supply submitted forged "Rebuttal to Peer Review Reports" ("Rebuttal Reports") to the American Arbitration Association ("AAA") in the names of various Prescribing Practitioners in connection with No-Fault insurance collection arbitrations brought by SMS Therapy Supply seeking reimbursement of pending claims for the Fraudulent Equipment.

72.     In keeping with the Defendants' scheme to exploit New York's No-Fault insurance system, the Defendants corrupted the No-fault arbitration process by collecting on the DME Provider's bills using forged Rebuttal Reports submitted to the AAA that fraudulently misled No-fault arbitrators into believing that the SAM Units were medically necessary and validly prescribed.

73.     Under the No-Fault Laws, GEICO and other New York automobile insurers are under statutory obligations to promptly process bills from injured automobile accident victims or assignees of these persons, like health service providers.  Further, under the No-Fault Laws, injured persons or their assignees – like SMS Therapy Supply -- may submit disputes over payment of bills to an expedited arbitration process operated by the AAA.  See N.Y. Ins. Law §5106(b) and 11 N.Y.C.R.R. §§ 65-4.1, et seq.

74.     In a typical expedited No-Fault arbitration proceeding where medical necessity of

a healthcare service or product is disputed by an insurer, the insurance company often submits to AAA a "Peer Review" report from a qualified healthcare provider that provides an expert opinion that the service or product in question was not medically necessary and therefore not reimbursable. In response, the health service provider will sometimes submit a rebuttal to the peer review report from a healthcare provider setting forth the health care service provider's position as to why the service or product in question was medically necessary.

75.     Here, the Defendants, "stacked the deck" against New York automobile insurance companies by submitting forged Rebuttal Reports to the AAA.  In fact, SMS Therapy Supply's submissions to AAA not only included forged and unauthorized prescriptions for the SAM Units, but also forged and unauthorized Rebuttal Reports to mislead the AAA arbitrators into finding that the Fraudulent Equipment was medically necessary and reimbursable.

76.     For example, Dr. Michael Alleyne, M.D. ("Dr. Alleyne") has sworn in an Affidavit that various prescriptions and rebuttals to peer reviews in his name submitted by another DME supply company were forged and unauthorized, and further, *he "never heard of or prescribed a Sustained Acoustic Medicine Device ("SAMs Device") to any of [his] patients*." Yet, in multiple arbitrations brought by SMS Therapy Supply against GEICO and other New York automobile insurance companies, SMS Therapy Supply submitted fraudulent Rebuttal Reports under the name of Dr. Alleyne in support of SMS Therapy Supply's billing for the SAM Units.  See e.g., SMS Therapy Supply Inc. and Geico, AAA Case No. 17-22-1247-1453 (4/3/23); SMS Therapy Supply Inc. and Geico, AAA Case No. 17-22-1247-1457 (4/3/23); SMS Therapy Supply Inc. and Allstate, AAA Case No. 17-21-1208-3708 (9/18/22); SMS Therapy Supply Inc. and American States Ins. Co., AAA Case No. 17-22-1257-6837 (9/15/23).

77.     Further, as mentioned previously, Dr. Kelly stated in an Affidavit that she never

issued prescriptions for SAM Units and she did not even know what a SAM Unit was and would not have prescribed it.  Yet, in multiple arbitrations brought by SMS Therapy Supply against GEICO and other New York automobile insurance companies, SMS Therapy Supply submitted fraudulent Rebuttal Reports under the name of Dr. Kelly in support of SMS Therapy Supply's billing for the SAM Units. See e.g., SMS Therapy Supply Inc. and Geico AAA Case No. 17-19-1138-1377 (8/31/20); SMS Therapy Supply Inc. and Geico, AAA Case No. 17-19-1138-1359 (8/17/20); SMS Therapy Supply Inc. and Allstate, AAA Case No. 17-19-1139-8465 (8/24/20).; SMS Therapy Supply Inc. and American Transit Ins. Co. AAA Case No. 17-21-1190-8695 (7/28/22)

78.     Despite the fact that both Dr. Alleyne and Dr. Kelly never prescribed a SAM Unit, would not prescribe a SAM Unit, and did not know what it was, the Defendants submitted to AAA forged Rebuttal Reports in their names that purported to, among other things, contend that there was a medical rationale and factual basis for prescription of the SAM unit, and that it was beneficial for the symptoms and pathology presented by the patient. These statements attributed to Dr. Alleyne and Dr. Kelly are false and fraudulent and misled arbitrators into believing that the SAM Units were medically necessary and that SMS Therapy Supply was entitled to payments for these devices.

79.     The Defendants submitted forged and unauthorized Rebuttal Review reports in support of SMS Therapy Supply's billing – and corrupted the AAA arbitration process in favor of SMS Therapy Supply – because the Defendant knew that the prescription and dispensing of SAM Units to Insureds on a rental basis is not medically necessary and is not done to treat or help the patients.

80.     Upon information and belief, each and every Rebuttal Report submitted by SMS

Therapy Supply to AAA in connection with the DME Provider's efforts to obtain reimbursement of No-Fault Benefits from New York automobile insurers is forged and unauthorized.

### C.   The Illegal Kickback and Referral Relationships with the Clinics

81.   Though ostensibly organized to provide a range of healthcare services to Insureds at a single location, the No-Fault Clinics from where the Defendants generated the prescription and referrals for the Fraudulent Equipment, in actuality, were organized to supply "one-stop" shops for No-Fault insurance fraud.

82.   Further, many of the No-Fault Clinics operate under the unlawful ownership and control of unlicensed laypersons and are actually nothing more than multidisciplinary medical mills organized to be convenient one-stop shops for No-Fault insurance fraud.

83.   For example, Dr. Kelly, a physician formerly employed by Metro Pain and its successor company, Triborough and whose name was used on forged prescriptions for SAM Units, has affirmed in an Affidavit that the No-Fault Clinic locations where she worked "were controlled by layperson managers and each of the locations ha[d] treatment protocols in place" and that she "was instructed to prescribe certain medications to all patients even if [she] felt they were not warranted."

84.   The No-Fault Clinics that steered prescriptions for the Fraudulent Equipment to the DME Provider including, among others, the following:

(i)      33-06 88th Street, Jackson Heights, New York

(ii)     204-12 Hillside Avenue, Queens, New York

(iii)    92-05 Rockaway Boulevard, Ozone Park, New York

(iv)    313 43rd Street, Brooklyn, New York

(v)     611 E 76th Street, Brooklyn, New York

(vi)     105-10 Flatlands Avenue, Brooklyn, New York

(vii)    3407 White Plains Road, Bronx, New York

(viii)   3632 Nostrand Avenue, Brooklyn, New York

85.     GEICO has received billing from many of the No-Fault Clinics from an ever-changing number of fraudulent healthcare providers, starting and stopping operations without any purchase or sale of a "practice"; without any legitimate transfer of patient care from one professional to another; and without any legitimate reason for the change in provider name beyond circumventing insurance company investigations and continuing the fraudulent exploitation of New York's no-fault insurance system.

86.     The Defendants entered into collusive arrangements with the Clinic Controllers and the Prescribing Practitioners at the No-Fault Clinics in order to obtain access to Insureds, so that the Defendants could implement and execute their fraudulent scheme and maximize the amount of PIP Benefits the Defendants could obtain from GEICO and other New York automobile insurers.  As part of the collusive arrangements, the Defendants steered the Clinic Controllers and the Prescribing Practitioners to direct prescriptions (or purported prescriptions) for the Fraudulent Equipment to the DME Provider in exchange for kickbacks or other financial consideration.

87.     In keeping with the fact that the prescriptions for Fraudulent Equipment were the result of unlawful financial arrangements between the DME Defendants and the Clinic Controllers, the prescriptions for Fraudulent Equipment were not medically necessary and were provided, to the extent provided at all, pursuant to predetermined treatment protocols, as further explained below.

88.     In further keeping with the fact that the prescriptions for the Fraudulent Equipment were the result of unlawful financial arrangements between the DME Defendants and the Clinic

Controllers, the prescriptions for Fraudulent Equipment were forged, unauthorized, or illegally duplicated prescriptions in many instances.

89.     In further keeping with the fact that the prescriptions for the Fraudulent Equipment were the result of unlawful financial arrangements between the DME Defendants and the Clinic Controllers, Insureds were never given access to the prescriptions or given the option to use any other DME retailer for the SAM Units other than SMS Therapy Supply.

90.     As a result of the unlawful financial arrangements, the DME Provider obtained large volumes of prescriptions (or purported prescriptions) and large volumes of Insureds' identifying information that enabled them to bill hundreds of thousands of dollars to GEICO, alone, for a single device, without operating any accessible retail location, without any legitimate marketing or advertising, and without offering or selling a variety of DME products beyond the Fraudulent Equipment.

91.     But for the payment of kickbacks from the DME Defendants, the Clinic Controllers, working with the Prescribing Practitioners, would not have had any reason to: (i) direct a substantial volume of medically unnecessary prescriptions to the DME Provider; (ii) make the Insureds' information available to the DME Provider; and/or (iii) provide the DME Provider with forged, unauthorized, or illegally duplicated prescriptions in many instances.

92.     Upon information and belief, the payment of kickbacks by the Defendants was made at or near the time the prescriptions were issued, but the Defendants and the Clinic Controllers affirmatively concealed the particular amounts paid since the payment of kickbacks in exchange for patient referrals violates New York law.

93.     As a result of the unlawful financial arrangements, the Defendants billed hundreds of thousands of dollars to GEICO, and likely millions of dollars to other New York automobile insurers, for the Fraudulent Equipment.

**D.      The Fraudulent Equipment was Prescribed Pursuant to Fraudulent Protocols In Order to Exploit Patients for Financial Gain**

94.     In addition to the unlawful financial arrangements between the Defendants and the Clinic Controllers, the prescriptions (or purported prescriptions) that were provided to the Defendants were the result of predetermined fraudulent protocols between and among the DME Defendants, the Clinic Controllers and the Prescribing Practitioners implemented solely to maximize the billing that the DME Defendants could submit to insurers, including GEICO, rather than to treat or otherwise benefit the Insureds.

95.     The Defendants' billing for the purported rental of the Fraudulent Equipment, typically for a period of 6 weeks, generally was for rental charges amounting to $2,964.00 per Insured.

96.     The Fraudulent Equipment is a so-called "SAM Unit" that is purportedly a battery powered, wearable low intensity ultrasound device for home-use.

97.     There is no specific HCPCS Code for a SAM Unit, and in fact, SMS Therapy Supply has submitted charges for the purported rental of these devices under a miscellaneous code, E1399.

98.     Commercial insurers do not provide reimbursement for SAM Units.  Aetna, for example, states that it considers "hands-free" ultrasound and low frequency sound devices experimental and investigational because their clinical values have not been established.

99.     In a legitimate clinical setting, treatment for neck, back, or shoulder pain should begin with well-established conservative therapies such as short-term bed rest, rehabilitative

exercises, physical therapy, and basic, non-steroidal anti-inflammatory analgesics, such as ibuprofen or naproxen sodium.

100.   If such conservative treatment does not resolve the patient's symptoms, the standard of care can include other conservative treatment modalities such as chiropractic treatment and the use of other well-studied medications.  These clinical approaches are well-established.

101.   In fact, the Insureds were virtually always directed to a course of supervised in-office conservative care, including physical therapy, chiropractic treatments, and pain medications, that was sufficient to treat the Insured's soft tissue injuries without the prescription and rental of a device not sufficiently proved to be effective.

102.   In a legitimate setting, when a patient injured in a motor vehicle accident seeks treatment by a healthcare provider, the patient's subjective complaints would be evaluated, and the treating provider would direct a specific course of treatment based upon the patients' individual symptoms or presentation and assess whether that course of treatment was working before prescribing a DME device, like a SAM Unit, that has not been proven sufficiently effective.

103.   In a legitimate setting, during the course of a patient's treatment, the provider may – but not always – provide DME that would aid in the treatment of the patient's symptoms.  There are numerous types of DME available and the specific type of DME that would be prescribed, along with the time period for its use to aid the treatment of the patient, should always directly relate to the patients' individual symptoms and presentation.

104.   There are a substantial number of variables that can affect whether, how, and to what extent an individual is injured in a given automobile accident.

105.    An individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact all will affect whether, how, and to what extent an individual is injured in a given automobile accident.

106.    It is extremely improbable that multiple Insureds of different ages, sexes, and physical conditions, and who were located in different areas within a vehicle, who were involved in the same automobile accident would routinely need prescriptions for DME of substantially the same type and, where rental equipment is involved, for the same period of time, if those Insureds were being provided with legitimate, individualized and genuine patient care.

107.    Nevertheless, in keeping with the fact that the prescriptions for the Fraudulent Equipment identified in Exhibit "1" were part of a predetermined protocol designed to maximize profits and not based upon medical necessity, multiple Insureds involved in the same accident were each prescribed the same SAM Unit, typically for the exact same rental period, which was not warranted by their purported injuries, to the extent they were even injured at all.  For example:

> (i)     On November 11, 2020, two insureds – G.F. and I.I. – were involved in the same automobile accident. Thereafter, G.F. and I.I. both purportedly were dispensed SAM Units on a rental basis for six weeks, and SMS Therapy Supply billed GEICO a total of $2,964.00 for each of these Insureds pursuant to the predetermined fraudulent protocol established by the Defendants.

> (ii)    On June 28, 2020, two insureds – F.R. and B.V. – were involved in the same automobile accident. Thereafter, F.R. and B.V. both purportedly were dispensed SAM Units on a rental basis for six weeks, and SMS Therapy Supply billed GEICO a total of $2,964.00 for each of these Insureds pursuant to the predetermined fraudulent protocol established by the Defendants.

> (iii)   On August 1, 2019, three insureds – M.B., R.C., and J.O. – were involved in the same automobile accident. Thereafter, M.B., R.C., and J.O. both purportedly were dispensed SAM Units on a rental basis for six weeks, and SMS Therapy Supply billed GEICO a total of $2,964.00 for each of these Insureds pursuant to the predetermined fraudulent protocol established by the Defendants.

(iv)     On September 25, 2021, three insureds – D.A., D.D. and D.D. – were involved in the same automobile accident. Thereafter, D.A., D.D. and D.D. both purportedly were dispensed SAM Units on a rental basis for six weeks, and SMS Therapy Supply billed GEICO a total of $2,964.00 for each of these Insureds pursuant to the predetermined fraudulent protocol established by the Defendants.

(v)      On August 20, 2019, two insureds – J.S. and T.T. – were involved in the same automobile accident. Thereafter, J.S. and T.T. both purportedly were dispensed SAM Units on a rental basis for six weeks, and SMS Therapy Supply billed GEICO a total of $2,964.00 for each of these Insureds pursuant to the predetermined fraudulent protocol established by the Defendants.

(vi)     On April 29, 2022, two insureds – J.R. and C.V. – were involved in the same automobile accident. Thereafter, J.R. and C.V. both purportedly were dispensed SAM Units on a rental basis for six weeks, and SMS Therapy Supply billed GEICO a total of $2,964.00 for each of these Insureds pursuant to the predetermined fraudulent protocol established by the Defendants.

(vii)    On November 11, 2019, two insureds – R.F. and D.F. – were involved in the same automobile accident. Thereafter, R.F. and D.F. both purportedly were dispensed SAM Units on a rental basis for six weeks, and SMS Therapy Supply billed GEICO a total of $2,964.00 for each of these Insureds pursuant to the predetermined fraudulent protocol established by the Defendants.

(viii)   On March 6, 2022, two insureds – A.R. and J.R. – were involved in the same automobile accident. Thereafter, A.R. and J.R. both purportedly were dispensed SAM Units on a rental basis for six weeks, and SMS Therapy Supply billed GEICO a total of $2,964.00 for each of these Insureds pursuant to the predetermined fraudulent protocol established by the Defendants.

(ix)     On August 3, 2019, two insureds – F.M. and A.M. – were involved in the same automobile accident. Thereafter, F.M. and A.M. both purportedly were dispensed SAM Units on a rental basis for six weeks, and SMS Therapy Supply billed GEICO a total of $2,964.00 for each of these Insureds pursuant to the predetermined fraudulent protocol established by the Defendants.

(x)      On November 1, 2018, two insureds – B.S. and M.R. – were involved in the same automobile accident. Thereafter, B.S. and M.R. both purportedly were dispensed SAM Units on a rental basis for six weeks, and SMS Therapy

Supply billed GEICO a total of $2,964.00 for each of these Insureds pursuant to the predetermined fraudulent protocol established by the Defendants.

(xi)    On September 4, 2019, two insureds – A.C. and M.C. – were involved in the same automobile accident. Thereafter, A.C. and M.C. both purportedly were dispensed SAM Units on a rental basis for six weeks, and SMS Therapy Supply billed GEICO a total of $2,964.00 for each of these Insureds pursuant to the predetermined fraudulent protocol established by the Defendants.

These are only representative examples.

108.    The prescribing and dispensing of the SAM Units to multiple Insureds involved in the same accident, for the exact same rental period, was not only unwarranted by the Insureds purported injuries, to the extent they were even injured at all, but made no medical sense given the lack of proven effectiveness of the SAM Units, the high charges for the rental of the units, and the lack of any general accepted treatment guidelines supporting the use of the devices.

109.    Furthermore, the timing of the prescribing and dispensing of the SAM Units to multiple Insureds by SMS Therapy Supply was inconsistent with SMS Therapy Supply's purported Letters of Medical Necessity submitted with its billing, which virtually always stated that the patient "had a very slow response to conservative therapy" and accordingly, a SAM Unit was prescribed for home-use.

110.    In keeping with the fact that the prescriptions for the Fraudulent Equipment identified in Exhibit "1" were part of a predetermined protocol designed to maximize profits and not based upon medical necessity, SMS Therapy Supply regularly dispensed SAM Units to Insureds for home-use less than 30 days after the Insureds' accidents, without allowing sufficient time for conservative care.  For example:

- On March 6, 2022, insured TGO was involved in automobile accident. Thereafter, only sixteen days after the accident, the Insured was dispensed a SAM Unit by SMS Therapy Supply for multiple weeks of home-use.

- On October 29, 2020, insured IB was involved in automobile accident. Thereafter, only eleven days after the accident, the Insured was dispensed a SAM Unit by SMS by Therapy Supply for multiple weeks of home-use.

- On September 9, 2022, insured RG was involved in automobile accident. Thereafter, only thirteen days after the accident, the Insured was dispensed a SAM Unit by SMS Therapy Supply for multiple weeks of home-use.

- On May 10, 2021, insured GH was involved in automobile accident. Thereafter, only seven days after the accident, the Insured was dispensed a SAM Unit by SMS Therapy Supply for multiple weeks of home-use.

- On September 3, 2022, insured MI was involved in automobile accident. Thereafter, only sixteen days after the accident, the Insured was dispensed a SAM Unit SMS Therapy Supply for multiple weeks of home-use.

- On September 10, 2022, insured NJ was involved in automobile accident. Thereafter, only eleven days after the accident, the Insured was dispensed a SAM Unit by SMS Therapy Supply for multiple weeks of home-use.

- On October 5, 2020, insured SLD was involved in automobile accident. Thereafter, only eleven days after the accident, the Insured was dispensed a SAM Unit by SMS Therapy Supply for multiple weeks of home-use.

- On May 25, 2020, insured SB was involved in automobile accident. Thereafter, only sixteen days after the accident, the Insured was dispensed a SAM Unit SMS by Therapy Supply for multiple weeks of home-use.

These are only representative samples.

111.    The prescribing and dispensing of the SAM Units to Insureds within weeks of the Insureds' accidents was not only not inconsistent with the Prescribing Practitioners' alleged statements that that Insureds had very slow responses to conservative care since insufficient time had elapsed for such care, but also, again, made no medical sense given the lack of proven effectiveness of the SAM Units, the high charges for the rental of the units, and the lack of any general accepted treatment guidelines supporting the use of the devices.

112.    Additionally -- in a legitimate setting -- when a patient is prescribed DME by a healthcare provider, the healthcare provider would indicate in a contemporaneous evaluation

report what specific DME was prescribed and why.  Such information is typically included in a contemporaneous report so the healthcare provider can recall what he or she previously prescribed and provide proper follow-up questions during a subsequent evaluation.

113.   In keeping with the fact that the prescriptions for the Fraudulent Equipment provided to Insureds was not medically necessary and provided, to the extent provided at all, pursuant to a predetermined fraudulent protocol, the contemporaneous examination reports written by healthcare providers virtually never made any reference to SAM Units being prescribed, nor was there any information in the contemporaneous examination reports to explain why the healthcare provider was prescribing the Fraudulent Equipment.

114.   Furthermore, and in keeping with the fact that the prescriptions for the SAM Units were not medically necessary and were provided pursuant to a predetermined fraudulent protocol, to the extent that Insureds returned for a follow-up examination, the follow-up examination reports never referenced or discussed the Insureds' previously prescribed SAM Units.

115.   In a legitimate setting, when a patient returns for a follow-up examination after being prescribed DME, the healthcare provider would inquire – and appropriately report – whether the previously prescribed DME aided the patient's subjective complaints. Such information is typically included so the healthcare provider can recommend a further course of treatment regarding the previously prescribed DME or adjust the patient's treatment as necessary.

116.   However, the follow-up examination reports from healthcare providers virtually always failed to include any information regarding Fraudulent Equipment prescribed to the Insureds on a prior date.

117.     In every claim identified in Exhibit "1", the Fraudulent Equipment was prescribed pursuant to predetermined protocols designed to maximize profits, and not based upon medical necessity.

### E.     The Inflated Charges for the Purported Rental of SAM Units

118.     Under the Medicaid Fee Schedule, the total monthly rental charges for equipment, supplies, and services, of Fee Schedule items is 10% of the maximum reimbursement amount.

119.     For dates of service prior to April 4, 2022, when DME was rented and charged to automobile insurers using HCPCS codes that are recognized by the Medicaid Fee Schedule but do not contain a maximum reimbursement amount then the maximum charge for a monthly rental is 10% of the acquisition cost for the DME or OD, which includes all supplies that are provided with DME rental. See New York State Medicaid Program Durable Medical Equipment Manual Policy Guidelines, p. 16; Gov't Emples. Ins. Co. v. MII Supply LLC, Index No. 616953/18, Docket No. 43 (N.Y. Sup. Ct. Nassau Cty. December 4, 2019) (applying the 10% of acquisition cost rule for DME rentals, including all supplies, within the New York State Medicaid Program Durable Medical Equipment Manual Policy Guidelines to No-Fault reimbursement for HCPCS Codes that are recognized by the Medicaid Fee Schedule but do not contain a reimbursement amount).

120.     While rental items were subject to a maximum monthly rental cost, there was no "lifetime" cap for a DME item rented to an Insured.

121.     In an effort to reduce the blatant fraud committed against insurers for abusive charges relating to DME, the New York State Workers' Compensation Board replaced the New York State Medicaid Program's Durable Medical Equipment Fee Schedule with a new New York State Workers' Compensation Durable Medical Equipment Fee Schedule ("WC DME Fee Schedule") that became effective on April 4, 2022.

122.     Among other things, the WC DME Fee Schedule limited the reimbursement rates of certain previously abused DME charges, such as charges for the rental of certain continuous passive motion devices. The changes made for the reimbursement for DME by the New York State Workers' Compensation Board are reflected in 12 N.Y.C.R.R. 442.2 (2022).

123.     Similarly, effective June 1, 2023, the New York State Department of Financial Services issued an amendment to 11 N.Y.C.R.R. 68, adding Part E of Appendix 17-C, to address No-Fault reimbursement for DME that is not specifically identified by the WC DME Fee Schedule.

124.     However, between the time period of April 4, 2022, and May 31, 2023, to address the vagueness of determining the reimbursement of No-Fault for certain changes not identified in the WC DME Fee Schedule, the New York State Department of Financial Services issued an emergency amendment explaining the standard for reimbursement when there is no price contained in the WC DME Fee Schedule.

125.     Specifically, this emergency amendment capped the total rental of items to Insureds under HCPCS Code E1399 at the lesser of: (1) the acquisition cost (i.e. the line item cost from a manufacturer or wholesaler net of any rebates, discounts or other valuable considerations, mailing, shipping, handling, insurance costs or any sales tax) to the provider plus 50%; or (2) the usual and customary price charged to the general public.

126.     For dates of service on or after June 1, 2023, Part E of Appendix 17-C of 11 N.Y.C.R.R. 68 establishes calculations for the maximum permissible daily rental rates of Non-Fee Schedule items and the maximum total accumulated charges, as follows:

>    (d)(1)  On or after June 1, 2023, the maximum permissible monthly rental charge for such durable medical equipment shall be one-tenth the acquisition cost to the provider.  Rental charges for less than one month shall be calculated on a pro-rated basis using a 30-day month.
>    (2)     The total accumulated rental charge for such durable medical equipment shall be the least of the:

(i)      Acquisition cost plus 50%;

(ii)     Usual and customary price charged by durable medical equipment providers to the general public; or

(iii)    Purchase fee for such durable medical equipment established in the Official New York Workers' Compensation Durable Medical Equipment Fee Schedule.

127.    In essence, these new calculations establish a daily rental rate for Non-Fee Schedule items at 1/300th of the acquisition cost, and establish a maximum total rental reimbursement per patient that is not to exceed the lesser of 150% of the acquisition cost of the item, the usual and customary price charged by other DME providers to the general public, or the purchase fee established in the Fee Schedule

128.    Accordingly, when a healthcare provider submits a bill to collect charges from an insurer for DME or OD using either a NF-3 or HCFA-1500 form, the provider represents – among other things – that:

(i)      the provider received a legitimate prescription for reasonable and medically necessary DME from a healthcare practitioner that is licensed to issue such prescriptions;

(ii)     the prescription for DME is not based on any unlawful financial arrangement;

(iii)    the DME identified in the bill was actually provided to the patient based upon a legitimate prescription identifying medically necessary item(s); and

(iv)    The fee sought for DME or OD provided to an Insured was not in excess of the price contained in the applicable DME Fee Schedule (Medicaid Fee Schedule or WC DME Fee Schedule) or the standard used for a Non-Fee Schedule item; or

(v)     The *pro rata* monthly rental fee sought for renting DME or OD to an Insured was not in excess of the standard for calculating rental reimbursement.

129.    In addition to the Defendants' submission of bills based upon unlawful financial arrangements, forged prescriptions, and medically unnecessary prescriptions pursuant to predetermined fraudulent protocols, the Defendants submitted bills to GEICO that misrepresented,

to the extent that any Fraudulent Equipment was provided, that the charges for Fraudulent Equipment were for permissible reimbursement rates, when they were not.

130.   When the Defendants' submitted bills to GEICO seeking payment for the Fraudulent Equipment, each of the charges identified HCPCS codes that were used to describe the items purportedly rented or provided to the Insureds.

131.   When the Defendants submitted bills to GEICO seeking payment for renting Non-Fee Schedule items billed under HCPCS Code E1399, which included SAM Units, the Defendants fraudulently misrepresented that the charges were no greater than the maximum permissible reimbursement amount of 10% of the Defendants legitimate acquisition cost for a monthly rental.

132.   For example, and as set forth in Exhibit "1", when the Defendants submitted bills to GEICO using HCPCS Code E1399 for purportedly renting SAM Units to Insureds – to the extent that the DME was actually provided to Insureds – the Defendants fraudulently misrepresented that they were able to collect $62.00 per day, or $1,860.00 per month, as 10% of their acquisition cost, for each SAM Unit rented to an Insured.

133.   The Defendants charges for the rental of SAM Units under HCPCS Code E1399 at $1,860.00 per month, which were represented to be 10% of their cost to acquire each SAM Unit, by extension makes the Defendants' acquisition cost $18,860.00 for each SAM Unit.

134.   In actuality, the acquisition cost for each SAM Unit was only a fraction of the acquisition cost used as a basis by the Defendants for their rental charges and, similarly, the maximum reimbursement rate was only a fraction of what was charged by the Defendants to GEICO.

135.    In all of the charges submitted to GEICO for the rental of SAM Units under HCPCS Code E1399, the Defendants fraudulently misrepresented that the maximum reimbursement rate was $62.00 per day when their maximum reimbursement was substantially less.

**III.    The Fraudulent Billing Defendants Submitted or Caused to be Submitted to GEICO**

136.    To support their fraudulent charges, Defendants systematically submitted or caused to be submitted hundreds of NF-3, HCFA-1500 forms, and/or treatment reports through the Defendants to GEICO seeking payment for the Fraudulent Services for which the Defendants were not entitled to receive payment.

137.    The Defendants' billing forms (*i.e*, NF-3 and/or HCFA-1500 forms) and treatment reports submitted to GEICO by and on behalf of the DME Provider were false and misleading in the following material respects:

(i)    The billing forms and supporting documentation submitted by and on behalf of the DME Provider uniformly misrepresented to GEICO that the Fraudulent Equipment was medically necessary. In fact, the Fraudulent Equipment provided, to the extent provided at all, were not medically necessary and was prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care;

(ii)    The billing forms and supporting documentation submitted by and on behalf of the DME Provider uniformly misrepresented to GEICO that the Defendants operated lawfully in compliance with licensing laws. In fact, the DME Provider dispensed the Fraudulent Equipment purportedly provided to Insureds as a result of unlawful kickback and financial arrangements;

(iii)    The billing forms and supporting documentation submitted by and on behalf of the DME Provider uniformly misrepresented to GEICO that the Defendants operated lawfully in compliance with licensing laws. In fact, in many instances, the Defendants billed GEICO for Fraudulent Equipment as a result of forged, unauthorized, or illegally duplicated prescriptions; and

(iv)    The billing forms and supporting documentation submitted by and on behalf of the DME Provider uniformly misrepresented to GEICO that the Defendants billed properly and dispensed SAM Units on a rental basis. In

fact, the bills for the Fraudulent Equipment submitted to GEICO by the Defendants fraudulently inflated the rental charges as the maximum daily rental rate for the SAM Units is substantially less than the $58.00 per day charged to GEICO.

**IV.    Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance**

138.    Defendants legally and ethically were obligated to act honestly and with integrity in connection with the billing they submitted, or caused to be submitted, to GEICO.

139.    To induce GEICO to promptly pay the fraudulent charges for the Fraudulent Equipment, Defendants systematically concealed their fraud and went to great lengths to accomplish this concealment.

140.    Specifically, the Defendants knowingly misrepresented and concealed facts related to the DME Provider in an effort to prevent discovery of the fact that the Defendants unlawfully exchanged kickbacks for patient referrals.

141.    Additionally, the Defendants entered into complex financial arrangements that were designed to, and did, conceal the fact that the Defendants unlawfully exchanged kickbacks for patient referrals.

142.    Additionally, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Equipment were medically unnecessary and performed – to the extent they were performed at all – pursuant to fraudulent pre-determined protocols designed to maximize the charges that could be submitted, rather than to benefit the Insureds who supposedly were subjected to the Fraudulent Equipment.

143.    The Defendants also hired law firms to pursue collection of the fraudulent charges from GEICO and other insurers. These law firms routinely filed expensive and time-consuming litigation against GEICO and other insurers if the charges were not promptly paid in full.

144.    The Defendants' collection efforts through numerous separate no-fault collection proceedings, which proceedings may continue for years, are an essential part of their fraudulent scheme since they know it is impractical for an arbitrator or civil court judge in a single no-fault arbitration or civil court proceeding, typically involving a single bill, to uncover or address the Defendants' large-scale, complex fraud scheme involving numerous patients across numerous different clinics located throughout the metropolitan area.

145.    GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days. GEICO takes steps to timely respond to all claims and to ensure that No-fault claim denial forms or requests for additional verification of No-fault claims are properly addressed and mailed in a timely manner.

146.    The facially valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and fraudulent litigation activity described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO incurred damages of more than $51,645.26 based upon the fraudulent charges for the Fraudulent Equipment.

147.    Based upon Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

<u>AS AND FOR A FIRST CAUSE OF ACTION</u>
**Against All Defendants**
**(Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)**

148.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

149.    There is an actual case in controversy between GEICO and the Defendants regarding more than $714,511.94 in pending no-fault insurance billing for the Fraudulent Equipment that has been submitted to GEICO under the names of the DME Provider (*i.e.*, SMS Therapy Supply).

150.    The DME Provider have no right to receive payment for any pending bills submitted to GEICO, because the Fraudulent Equipment, to the extent provided at all, were not medically necessary and was prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care.

151.    The DME Provider have no right to receive payment for any pending bills submitted to GEICO because the DME Provider dispensed the Fraudulent Equipment purportedly provided to Insureds through the use of unlawful kickback and financial arrangements.

152.    The DME Provider have no right to receive payment for any pending bills submitted to GEICO because, in many instances, the Defendants billed GEICO for Fraudulent Equipment as a result of forged, unauthorized, or illegally duplicated prescriptions.

153.    The DME Provider have no right to receive payment for any pending bills submitted to GEICO because the bills for Fraudulent Equipment submitted to GEICO by the Defendants fraudulently inflated the charges to GEICO.

154.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that the DME Provider have no right to receive payment for any pending bills submitted to GEICO.

**AS AND FOR A SECOND CAUSE OF ACTION**
**Against All Defendants**
**(Common Law Fraud)**

155.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

156.    SMS Therapy Supply and Mirzokandov intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Equipment.

157.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that the billed-for services were medically necessary when, in fact, the Fraudulent Equipment, to the extent provided at all, was not medically necessary and was prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; (ii) in every claim, the representation that SMS Therapy Supply was properly licensed and acting lawfully and, therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when, in fact they dispensed the Fraudulent Equipment purportedly provided to Insureds as a result of unlawful kickback and financial arrangements; (iii) in every claim, the representation that SMS Therapy Supply was properly licensed and acting lawfully and, therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when, in fact, in many instances, they billed GEICO for Fraudulent Equipment as a result of forged, unauthorized, or illegally duplicated prescriptions; and (iv) in every claim, the representation that the billed-for services were

properly billed in accordance with the Fee Schedule, when, in fact the bills for Fraudulent Equipment submitted to GEICO by the Defendants fraudulently inflated the charges to GEICO.

158.    SMS Therapy Supply and Mirzokandov intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through SMS Therapy Supply that were not compensable under the No-Fault Laws.

159.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $51,645.26 pursuant to the fraudulent bills submitted by Defendants. The chart annexed hereto as Exhibit "1" sets forth a representative sample of the fraudulent claims that have been identified to-date that SMS Therapy Supply submitted, or caused to be submitted, to GEICO.

160.    SMS Therapy Supply and Mirzokandov's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

161.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## AS AND FOR A THIRD CAUSE OF ACTION
**Against All Defendants**
**(Unjust Enrichment)**

162.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

163.    As set forth above, SMS Therapy Supply and Mirzokandov have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

164.     When GEICO paid the bills and charges submitted by or on behalf of SMS Therapy

Supply for No-Fault Benefits, it reasonably believed that it was legally obligated to make such

payments based on the Defendants' improper, unlawful, and/or unjust acts.

165.     The Defendants have been enriched at GEICO's expense by GEICO's payments,

which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper,

unlawful, and unjust billing scheme.

166.     The Defendants' retention of GEICO's payments violates fundamental principles

of justice, equity and good conscience.

167.     By reason of the above, the Defendants' have been unjustly enriched in an amount

to be determined at trial, but in no event less than $51,645.26.

**AS AND FOR A FOURTH CAUSE OF ACTION**
**Against Mirzokandov and the John Doe Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

168.     GEICO incorporates, as though fully set forth herein, each and every allegation in

the paragraphs set forth above.

169.     SMS Therapy Supply is an ongoing "enterprise," as that term is defined in 18 U.S.C.

§ 1961(4), that engages in activities that affected interstate commerce.

170.     Mirzokandov and the John Doe Defendants knowingly conducted and/or

participated, directly or indirectly, in the conduct of SMS Therapy Supply's affairs through a pattern

of racketeering activity consisting of repeated violations of the mail fraud statute, 18 U.S.C. § 1341,

based upon the use of the United States mails to submit or cause to be submitted hundreds of

fraudulent charges that SMS Therapy Supply was not eligible to receive under the New York No-

Fault Laws because: (i) the Fraudulent Equipment, to the extent provided at all, were not medically

necessary and was prescribed and dispensed pursuant to predetermined fraudulent protocols

42

designed to exploit the patients for financial gain, without regard for genuine patient care; (ii) the DME Provider dispensed the Fraudulent Equipment purportedly provided to Insureds through the use of unlawful kickback and financial arrangements; (iii) in many instances, the Defendants billed GEICO for Fraudulent Equipment as a result of forged, unauthorized, or illegally duplicated prescriptions; and (iv) the bills for Fraudulent Equipment submitted to GEICO by the Defendants fraudulently inflated the charges to GEICO.  A representative sample of the fraudulent billings and corresponding mailings submitted to GEICO that comprise the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

171.    SMS Therapy Supply's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers.  The predicate acts of mail fraud are the regular way in which Mirzokandov operated SMS Therapy Supply, insofar as SMS Therapy Supply is not engaged as a legitimate supplier of DME and/or OD, and therefore, acts of mail fraud are essential in order for SMS Therapy Supply to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a continued threat of criminal activity, as does the fact that Mirzokandov continues to attempt collection on the fraudulent billing submitted by SMS Therapy Supply to the present day.

172.    SMS Therapy Supply is engaged in inherently unlawful acts, inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers.  These inherently unlawful acts are taken by SMS Therapy Supply in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

173.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $51,645.26 pursuant to the fraudulent bills submitted through SMS Therapy Supply.

174.    By reason of its injury, GEICO is entitled to treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**FIFTH CAUSE OF ACTION**
**Against Mirzokandov and John Doe Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

175.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

176.    SMS Therapy Supply is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

177.    Mirzokandov and the John Doe Defendants are owners of, employed by, or associated with the SMS Therapy Supply enterprise.

178.    Mirzokandov and the John Doe Defendants knowingly have agreed, combined, and conspired to conduct and/or participate, directly or indirectly, in the conduct of SMS Therapy Supply' affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges since its inception seeking payments that SMS Therapy Supply was not eligible to receive under the New York No-Fault Laws because: (i) the Fraudulent Equipment, to the extent provided at all, were not medically necessary and was prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; (ii) the DME Provider dispensed the Fraudulent Equipment purportedly provided to Insureds through the use of unlawful kickback

and financial arrangements; (iii) in many instances, the Defendants billed GEICO for Fraudulent Equipment as a result of forged, unauthorized, or illegally duplicated prescriptions; and (iv) the bills for Fraudulent Equipment submitted to GEICO by the Defendants fraudulently inflated the charges to GEICO. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1". Each such mailing was made in furtherance of the mail fraud scheme.

179.   Mirzokandov and the John Doe Defendants knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

180.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $51,645.26 pursuant to the fraudulent bills submitted through SMS Therapy Supply.

181.   By reason of its injury, GEICO is entitled to treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**WHEREFORE**, Plaintiffs, GEICO, demand that a Judgment be entered in their favor:

A.   On the First Cause of Action against the Defendants, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that SMS Therapy Supply, has no right to receive payment for any pending bills for the Fraudulent Equipment submitted to GEICO, amounting to more than $714,511.94;

B.   On the Second Cause of Action against the Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $51,645.26, together with

punitive damages, costs, interest, and such other and further relief as the Court deems just and proper; and

       C.     On the Third Cause of Action against the Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $51,645.26, together punitive damages, costs, interest, and such other and further relief as the Court deems just and proper.

       D.     On the Fourth Cause of Action against the Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $51,645.26, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest, and further relief as the Court deems just and proper.

       E.     On the Fifth Cause of Action against the Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $51,645.26, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest, and further relief as the Court deems just and proper.

Dated: October 20, 2023
       Uniondale, New York

                      RIVKIN RADLER LLP

                      By: */s/ Michael A. Sirignano*
                           Michael A. Sirignano, Esq.
                           Barry I. Levy, Esq.
                           Joshua D. Smith, Esq.
                      926 RXR Plaza
                      Uniondale, New York 11556
                      (516) 357-3000
                      RR File:  5100-3805
                      *Counsel for Plaintiffs Government Employees*
                      *Insurance Company, GEICO Indemnity Company,*
                      *GEICO General Insurance Company and GEICO*
                      *Casualty Company*